Well, how was the trip? I'm not sure it was. Well, we're glad that we could accommodate you. I guess we'll just proceed, and you all can come to the podium, and we look forward to hearing your argument. May it please you, the Court? Counsel for Appellant Steven Schmid. I'd like to reserve about half my time for a rebuttal, if need be. Just keep it up, and we'll try to help you. Okay, great. Thank you. So, if you look at the last paragraph of the majority in Harris v. Quinn, I think there's a statement that encapsulates really what the appellant is trying to strive for here. That statement is this. No person in this country may be compelled to subsidize speech by a third party that he or she does not even wish to support. So the issue here, as far as I can tell, is, is the opt-in, opt-out provision of the Sonoma Power Company one that compels Mr. Schmid's speech? I guess that's what I'm struggling with, Counselor. As I read the record, your client had three options, one of which was just a very simple choice that he wanted to stay with PG&E, and that was the end of it. At one time, no issue, no problem. He elected not to do that, knowing that the result would be that he would be forced to go with a CPA, but he even had two choices after he was originally assigned to for free transfer out of that. How is that compulsion? Well, the record, I don't think, states that Mr. Schmid may have been given the opportunity to opt-in or opt-out based on the notices that he actually saw. You're disputing that the notices themselves gave him an opportunity to opt-out? The notices themselves, as per the statute, would give somebody the option to opt-out. The issue is, does the records, does the records support that Mr. Schmid may have gotten the notices, and that could be something new. It's just your condition that he didn't get the notices. That's my understanding is that he may have gotten the notices, but I mean, this isn't hypothetical. If he says he didn't get the notice and can prove that up, we can have a contest about that. I thought they argued and made two of the briefs. I mean, this isn't about maybes. I mean, it's very theoretical. Right. My perspective contrived, but he apparently made a judgment not to opt-out. He made a judgment not to opt-out, but does he have to go through the act of opting-out? Does he have to sit down and go ahead and take the action to put a stamp on the envelope? I doubt if they required a stamp. You could probably do it on a website. They might even give you a postage page envelope, and the record doesn't develop all that either. Don't make me think it's a huge effort. He is elected not to opt-out. There's not burden put on him to opt-out, is there? You have to really argue that there's serious burden. Not a significant burden, but was it a significant burden for the people in Harris v. Quinn, the employees, to have to opt-out of their... In the middle of the year, caught by surprise, the Supreme Court said yes, but the Supreme Court said just fine to an annual election. I mean, if you're a member of one of the public employee unions and you want to opt-out from paying the political-type stuff, the Supreme Court has said, okay, that works. Why doesn't it work here? Well, it doesn't work here because, once again, maybe Mr. Schmidt elected not to opt-out to bring this issue before the court. That's where the contrived part is. So why is it the First Amendment should be used as a tool to prevent something like this from happening? Well, I mean, the objection really doesn't appear to be to the opt-out procedure. It appears to be to the whole Sonoma Clean Power Program. Well, that's true. Okay, so why is the First Amendment an obstacle to the state legislature and the county council being able to put together this program? Mr. Schmidt's raising issues regarding this ability to be forced to show them associated even for that time period. You know, it's the old days when utilities were considered a natural monopoly. You had franchises. There was only one utility. Was that a violation of the First Amendment because the only person that had the franchise in most of that part of the state was PG&E? Well, in the PG&E case, they raised the same issue. Why should they be compelled to distribute information in their lulls? What do you guess what they thought? You're not being asked to distribute any information. You're not compelled to give somebody else a speech. You're just being asked, your client's being asked, okay, you want electricity from Sonoma Clean Power, you want your electricity from PG&E. Check one. If you don't check, we're going to give you the Sonoma Clean Energy. And that's what this case is about, the default. That is the requirement to opt out, or I can let you check one or two boxes, and how that's a First Amendment issue is giving me some trouble. I see your point, Jonathan. Also, how many other citizens, just like getting a credit card bill, just, like, did not, didn't see it and then went off their way? We don't see it. But how is that a violation of your client's First Amendment rights? It's a default system. And it works only because it's a default system. Most people won't respond. I understand that. And you can complain about that on policy grounds. But finding a constitutional basis to object is where I'm having some trouble. How is it violating your client's First Amendment rights if the county realizes that if you make people check one or two boxes, you'll get a lot of non-responses? And so this way they've set it up, if you don't check a box, then you're automatically put into the Clean Energy Department. I understand the policy objection to that. I don't understand why that's a First Amendment violation. And unless you give me a reason to think it's a First Amendment violation, your claim's not going to fare very well with me. I understand. And so, once again, it's stated in the briefs that it deals with the Forest Association. The Forest Association, of course, as you point out, is, it requires two amendments, actually, by Mr. Smetana to be associated with it. But ultimately, it's just a question where you look at it. It's like, if the legislature empowers the county to form one of these CCAs, then it's got to have some sort of default position, right? I mean, there's always, you know, and are you saying that the default position has to be the status quo? And if so, what's the legal basis for that? Well, I mean, you control people in all three plans, right? And so, there's got to be something to the people that don't do anything. Understood. So, in that context, wouldn't the default, natural default be position if they've got a better system, they've got better arguments for this alternative energy for snow and clean power that people would naturally want to go and opt in? That is what would happen in normal industry. Somebody couldn't come to you and say, well, we're going to automatically assign you a, for example, a new cell phone for Verizon because you don't opt into it. You go in, you allow Verizon. Well, the Forest Association, that was always done with public utilities. The opt-in is a public utility. Well, yeah. I mean, it's the forest electricity. You've got the public utility that was in your geographic area. There's a constitutional association question raised. Well, moreover, I think your analogy to the private industry is really inept here because what AT&T might do or somebody else is quite different from, I guess they're regulating, that might be a little different here, but it is a regular credit card situation. It's quite different from here where you have a legislature regulating the delivery of utilities, trying to promote environmental protection and the like. I assume you're not arguing that the legislature didn't have a legitimate legislative purpose in enacting this bill, are you? I believe they had a legitimate legislative purpose. If they did, if they had a legitimate legislative purpose and they authorized this approach, what's so onerous about that? There is certainly no constitutional issue. So I'm struggling with if there is a legitimate legislative purpose, it's a minimalist choice on your client's part. You have been legitimate purpose. What's the problem? I think the problem is the methodology of placing somebody into a program. Before, you had no choice at all. Now you at least have a choice. So what's the problem there? Why can't the legislature or this company that's regulated make this choice? It's a minimalist requirement on your client's part to check the box. As you point out, your client didn't do it because he wanted to challenge the regulation. But it wasn't because it was onerous. He just wanted to challenge the regulation. And I think we're struggling with what's the problem here? I mean, if you want to get it right, check the box. You don't have a problem. But why, if there's a legitimate legislative purpose, does he have the ability to say, well, you can't do that? What case can you rely upon that backs up your position? I think the case I'd come back to is the PG&E case. Because really, PG&E is the sole monopoly. It's a content-neutral provider of electricity. They didn't espouse any political positions one way or the other. In fact, they were very neutral on that point. But it's clear from the legislative intent, and then also from the organization documents and record for the Stoma Power Company, that they have a, what's often called a political purpose. They believe in a certain type of energy that reflects the political goal. I said that's true. Legislature runs on a political basis. What's wrong with that? That's the way the system works. You may not like that. It's really, if you're going to, I don't like that. I'm going to check the box. I'm going to stay with PG&E. What's the matter with that? You're not compelled to do anything. Your client takes very little effort, but a lot of people just don't take that effort. Well, that's their problem, isn't it? So what does that have to do with your client's First Amendment right? There's a disconnect there. Right. And so, I understand what you're saying. It is a de minimis burden on my client, and it was brought for the purposes of dealing with this opt-in, opt-out statute. And I think the lower court recognized that. That's why we went straight for motion for judgment on the pleadings, and then we're up here right now because, like many cases, it comprises in that fashion. But does a de minimis burden necessarily mean you can't challenge the constitutionality of that? But where's the constitutional challenge? I mean, we ask you, how does the fact that other people have this opt-in, opt-out thing, they may be too apathetic to deal with. What does that have to do with your client's constitutional rights being infringed? Your client doesn't like the policy. That doesn't translate into a constitutional objection. I'm just even theoretically struggling, and you before talked about how it was an enforced speech. But we're out of that now. We're down to the practical realities, and there's no connection. So, why are we here? Okay. Is this one of those cases that we studied in law school and we never knew what it meant, but now we know what de minimis means, right? I see your point, Your Honor. Okay. Can I say a question, Ted? Yes, please. Okay, let's hear it. You've probably never been called that before, have you? Hi, please, the Court. My name is Kara Abelson. I represent Appellate Sonoma Claim Power. I think the Court has very well hit on the head what the issue is in this case, which is that an appellate was never forced to do anything. The factual premise of an appellate's constitutional claim is that he was forced to terminate his contract with PGD and enroll in Sonoma Claim Power. However, the record makes very clear that he was provided adequate notice of the automatic enrollment that was coming up and that he was given an opportunity to opt out before he was ever enrolled and ever paid a penny to Sonoma Claim Power. Can you answer this question for me? It's a very good issue. Does the record show that the appellate received the original notice or any subsequent notices? Your Honor, the record that has not been directly addressed, the record does show that he was provided with the two notices before the automatic enrollment. The appellate just never made the argument that he did not receive them. He did not make the argument, right? Exactly, and he does acknowledge that notices are sent in his argument, so one would presume he received them. The opt-out system is very minimal. All one has to do is call a toll-free number or fill out a form on Sonoma Claim Power's website. In doing so, he's never asked why he wants to opt out. He's never asked his political beliefs on clean energy. He simply is just selecting a service provider. What do you think about the argument that was advanced by Mr. Schmidt that the default position that was chosen by the county is somehow inappropriate because rather than searching as the default position, the existing status quo, it requires you to default and it would change? I agree with what the court said earlier that that is a policy argument that the California legislature made based on legitimate concerns that CCAs were not sustainable without doing the opt-out procedure, and in furtherance of creating a competitive market and undoing the PG&E monopoly. We have a situation where initially PG&E was the only option for an energy provider. By Sonoma Claim Power creating a CCA, they have expanded those options. They've given people now two options, which necessarily requires people to now choose between the two options. All that's happening here is that consumers are now picking a service provider, which happens in so many other aspects of life. So we're not picking a provider? We're not picking a provider. They can do whatever they want is our stance, and in fact, a client can opt out today from Sonoma Claim Power. What would it cost him to opt out today? $5 for the administrative costs. What happens? I mean, the law of unintended consequences kind of screams large here because 20-some years ago the state of California embarked on deregulation of the power industry, and in the year 2000, it proved to be a nightmare. And speaking personally, I'm still hoping to pick up the pieces because I'm in the first panel where we've had hundreds of cases. What happens if these pre-constitutions, which strike me as slightly utopian about how we're going to produce locally controlled power cleanly cheaper, but if those don't turn out to be the case and it turns out the electricity rates go sky high, and maybe somebody at the beginning of the process looks at this and says, this is a disaster, this is not going to work, I don't want to pay those sky high rates, and for that reason opts, but says, okay, the county council must know what to do, they'll trust them and take the option they've selected for me. And then a couple years later, when he starts getting these electricity bills that are sky high, so if I want out, should he be required to pay anything then? Well, there's two things that could happen in that case. Someone could opt out, or the California legislator could make another policy decision, which is that the CCAs are not working and they could revise the legislation. In terms of paying the $5 administration fee, that is just an administrative fee, that is very nominal for them to switch the account over back to PG&E. I do not think $5 is by any means an extreme burden to pay for the administrative costs of switching providers. In fact, most utility companies would charge you far more than that to do that. Are you authorized to purchase and waive the $5 fee for Mr. Eman? My client has considered that, and I'm sure that's something we could agree to. If that were? If that were. If Appellate was willing to take that stance, I think that's something we could discuss. Unless the board has any further questions, I'd like to submit. No, please do. Thank you. Thank you very much. You have some rebuttal time, counsel, if you'd like to take it. I'm doing good. I'm just looking at the record very quickly. If you look at the answer to record, page 96, you can actually look at the provision for opting in and opting out. And what it shows on page 96 and 97 is that once you've opted in, there does not appear from the record to be a mechanism for opting out after the four notices. That's not my understanding. My understanding is that there is a fee, $5 fee, just mentioned, but that you can opt out at any time once you pay the fee. You initially have, I think, two options. Initially you get out, two options afterward to get out, all without fee. And then thereafter, there's a, I guess, $5 fee. I don't know whether that's correct, but I think that's right. But I don't think there's any restriction on your opting out at any time. You're fine. I can't understand the prevailing argument, doesn't it? There is no compulsion. Then I'll submit on that, Your Honor. Okay. It gets back to the definitive list of uncared likes, right? Exactly. Okay. And I appreciate you staying late for the court. We're happy to do it, and I hope you had a good flight, and I hope you have a nice weekend. Thank you, Your Honor. Thank you. Case is argued as submitted, and the court stands at recess for the day.
judges: Clifton, M. Smith, Erickson